**2023 UT 8**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

HI-COUNTRY ESTATES HOMEOWNERS ASSOCIATION, PHASE II,
*Appellee,*

*v.*

MOUNTAINTOP PROPERTIES, L.L.C.,
*Appellant.*

No. 20200267
Heard February 9, 2022
Filed May 4, 2023

On Direct Appeal

Third District, Salt Lake
The Honorable Richard E. Mrazik
The Honorable Kent R. Holmberg
No. 170904219

Attorneys:
Stephen T. Hester, Bradley M. Strassberg, Salt Lake City, for
appellee

Michael R. Menssen, Jordan C. Hilton, Russell A. Cline, Salt Lake
City, for appellant

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE, JUDGE
MORTENSEN, and JUDGE TENNEY joined.

Due to their retirements, JUSTICE HIMONAS and JUSTICE LEE did not
participate herein; COURT OF APPEALS JUDGE DAVID N. MORTENSEN
and COURT OF APPEALS JUDGE RYAN D. TENNEY sat.

JUSTICE HAGEN became a member of the Court on May 18, 2022,
after oral argument in this matter, and accordingly did not
participate.

JUSTICE POHLMAN became a member of the Court on August 17,
2022, after oral argument in this matter, and accordingly did not
participate.

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1    The Hi-Country Estates Homeowners Association (HOA) sued Mountaintop Properties, L.L.C., an owner of a lot within its boundaries, for unpaid assessments. And the district court granted summary judgment in the HOA's favor. This appeal presents the question of whether the HOA has authority to levy such assessments, despite alleged defects in the HOA's founding documents. Mountaintop contends that the person who formed the HOA and signed its governing documents approximately fifty years ago did not actually own most of the land he included within the HOA's boundaries—including the lot at issue here. It argues that this renders the HOA's governing documents, and consequently the HOA's authority, absolutely void and incapable of ratification.

¶2    The same question is presented in a related case that we resolve today, *Hi-Country Estates Homeowners Ass'n, Phase II v. Frank*, 2023 UT 7, --- P.3d ---, in which the HOA sued to collect unpaid assessments it had levied on two other lots. In both cases, we conclude that the HOA does have authority to assess the lots at issue because the HOA's members have ratified its authority over time. We affirm.

## BACKGROUND[1]

### *The HOA and Its Governing Documents*

¶3    In 1973, a man named Charles Lewton signed and recorded a Certificate of Incorporation and Protective Covenants for a development called "Hi-Country Estates, Phase II." The documents established and incorporated the HOA and included within its boundaries approximately 2,000 acres of land near Herriman, Utah. The property at issue here was included within the boundaries of the HOA and is referred to as Lot 90.

¶4    The 1973 protective covenants stated that "the owners of the herein described property, hereby subject said property to the following covenants, restrictions and conditions." Among other things, the covenants provided that each lot owner would be a

---

[1] Where possible, the background facts are drawn from the district court's recitation of undisputed material facts in its summary judgment order.

member of the HOA and would "pay annually his pro-rata share of the cost to maintain the roads, streets and common areas."

¶5 The HOA's governing documents have been revised and amended over the years. The current governing documents are the Certificate of Incorporation and Addendum to the Certificate of Incorporation; the Second Revised Protective Covenants, including subsequent amendments, dated December 10, 1980 (1980 Covenants); and the First Revised—1988 By-Laws, including subsequent amendments (1988 By-Laws) (together, governing documents).

¶6 The 1980 Covenants were signed by the President, Vice President, and Directors of the HOA, purportedly "in response to the wishes of the majority of Association Members during the Annual Membership Meeting on July 6, 1980." Like the original protective covenants, the 1980 Protective Covenants stated that a homeowners association would be established, that each lot owner would be a member of the association, and that each lot owner would pay a pro-rata share of the assessments. The document was recorded with the Salt Lake County Recorder.

¶7 The 1988 By-Laws were enacted at an annual meeting of HOA members. "The [1988] By-Laws, like the Covenants, provide[d] for the obligation of lot owners to pay assessments, [and] the ability of the HOA to collect such assessments . . . ." The 1988 By-Laws were also recorded with the Salt Lake County Recorder.

*Lot 90*

¶8 Kathy Engle and her then-husband purchased Lot 90 in 1977. They later divorced, and Engle retained a 50 percent interest in the property. Thereafter, she quitclaimed her interest in the property to appellant Mountaintop Properties, L.L.C., of which she is the principal.

¶9 The HOA has assessed Lot 90 since at least 1983. For years, "including [from] 1985–1992," Engle—either in her own capacity or as principal of Mountaintop—paid the assessments. At times, Engle stopped paying the assessments, and the HOA recorded a notice of lien against Lot 90. By 2011, Engle had stopped paying the assessments charged by the HOA entirely.

¶10 In 2015, Engle participated in an effort to dissolve the HOA. Acting as Mountaintop's principal, she signed a petition calling for the HOA to be dissolved, in which she stated that "[b]y

virtue of owning the above-referenced lot in [the HOA] I am a member of the [HOA]."

¶11 Around this same time, other lot owners who were involved in separate litigation against the HOA claimed that they had discovered evidence showing that when Charles Lewton established the HOA and signed the governing documents in 1973, he owned less than 1 percent of the property he included in the HOA's boundaries. Mountaintop asserts that the acreage Charles Lewton owned did not include Lot 90.

¶12 Based on this information, in 2016 a group of lot owners referred to collectively as "WDIS" filed a quiet title action against the HOA. WDIS moved for a declaration that the governing documents signed by Charles Lewton were void *ab initio* (from the beginning), because it violated public policy for Lewton to encumber property that he did not own. *WDIS, LLC v. Hi-Country Ests. Homeowners Ass'n, Phase II (WDIS II)*, 2022 UT 33, ¶ 9, 515 P.3d 432.

*The HOA's Suit Against Mountaintop for Unpaid Assessments*

¶13 One year later, the HOA sued Mountaintop in the district court for past-due assessments. The HOA subsequently moved for summary judgment. In response, Mountaintop filed a "Motion to Declare Plaintiff's Liens as 'Wrongful Liens' and Remove Them and Award Statutory Damages and Attorney's Fees and Quiet Title." It argued, among other things, that the HOA's governing documents were unauthorized encumbrances on Lot 90, and therefore they violated the Wrongful Lien Act.

*Summary Judgment*

¶14 The district court granted judgment in the HOA's favor. It concluded that the HOA was entitled to collect the unpaid assessments because the HOA members in general, and Engle and Mountaintop in particular, had ratified the HOA's authority, including "act[ing] as though the HOA had authority to assess Lot 90." The court explained,

> Because the HOA's Articles of Incorporation and Covenants were of record when Mountaintop took ownership of Lot 90, because decades have passed since the time those documents were recorded, because the members of the HOA have since acted as though the HOA was a legitimate governing entity for decades and because no competing entity has arisen, the Court rules that the

4

> HOA's ability to govern and make assessments against the lots within its purported jurisdiction has been ratified by its members.
>
> . . . .
>
> Mountaintop itself, as well as its principal Kathy Engle, has ratified the existence and authority of the HOA by failing to challenge that authority at any time during the course of ownership since 1983, by expressly admitting such authority in the [2015 Petition], and by paying charges and assessments at various times.

¶15 And the court relied upon *Swan Creek Village Homeowners Ass'n v. Warne*, 2006 UT 22, 134 P.3d 1122, and its progeny, *Osmond Lane Homeowners Ass'n v. Landrith*, 2013 UT App 20, 295 P.3d 704, to rule that the members of the HOA had ratified its authority to assess lots within its boundaries, even if there were deficiencies with the HOA's governing documents. The court explained,

> Utah law is clear that even if there was some technical deficiency with one or more of the HOA's governing documents, the fact that the HOA has been existing, living and breathing as a homeowner association for 40 years, conducting meetings and elections, governing the lots at issue, making, collecting and enforcing assessments for decades, making improvements, creating committees—all with decades of cooperation of and participation from its members—means that the authority to act as such has been ratified by its members as a matter of law.

(Citing *Swan Creek*, 2006 UT 22, ¶¶ 30–39; *Osmond Lane*, 2013 UT App 20, ¶ 17.)

¶16 The district court ordered judgment in the amount of the past-due assessments to the HOA. It simultaneously denied Mountaintop's motion.

*Mountaintop's Post-Judgment Motion*

¶17 In response, Mountaintop filed a post-judgment motion arguing, among other things, that it should not be liable for the entire amount of unpaid assessments because it was only a 50 percent owner of Lot 90. The district court denied this motion and

again entered judgment against Mountaintop for the entire amount of past-due assessments, with interest and attorney fees.

¶18 Mountaintop appeals. It argues the district court erred because the documents establishing the HOA are void *ab initio* (from the beginning) and therefore cannot be ratified. In the alternative, it argues that the court incorrectly determined that ratification occurred here. And finally, Mountaintop contends that if we conclude the HOA has authority to assess Lot 90, the district court incorrectly calculated the amount it owes the HOA because it should be responsible for only half of the unpaid assessments.

¶19 We exercise jurisdiction under Utah Code section 78A-3-102(3)(j).

**STANDARD OF REVIEW**

¶20 "In reviewing the trial court's decision to grant summary judgment, we give the court's legal decisions no deference, reviewing for correctness, while reviewing the facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Dairy Prod. Servs., Inc. v. City of Wellsville*, 2000 UT 81, ¶ 15, 13 P.3d 581.

**ANALYSIS**

¶21 We first address Mountaintop's argument that the HOA has no authority to assess Lot 90 because the governing documents that established the HOA are void *ab initio* and therefore cannot be ratified. As we will explain, we have determined in another case involving the same HOA that the governing documents at issue are voidable rather than absolutely void. *WDIS, LLC v. Hi-Country Ests. Homeowners Ass'n, Phase II (WDIS II)*, 2022 UT 33, ¶ 52, 515 P.3d 432 ("We hold that restrictive covenants that are recorded without the signature of the affected landowner are voidable, not absolutely void, and they are therefore ratifiable.") Our holding in *WDIS II* applies here, and consequently the HOA's authority is capable of ratification.

¶22 We then address Mountaintop's claim that the district court erred in determining that the members of the HOA had ratified the HOA's authority. In a related case issued today, which involves the same HOA and similar facts, we conclude that the members of the HOA have sufficiently ratified the association's authority. *See Hi-Country Ests. Homeowners Ass'n, Phase II v. Frank*, 2023 UT 7, ¶ 74, --- P.3d --- ("[W]e conclude that the district court properly applied the principles undergirding *Swan Creek* to determine that the HOA members have collectively ratified the

HOA's authority."). That holding also applies here. Accordingly, the HOA is authorized to levy assessments against Lot 90.

¶23 And finally, we address Mountaintop's argument that the district court incorrectly calculated the amount it owes the HOA. Mountaintop argues that because it owns only a 50 percent interest in Lot 90, it should be liable for only half of the unpaid assessments. But because Mountaintop does not support this argument with sufficient legal analysis, we conclude it has not met its burden of persuasion.

## I. THE HOA'S GOVERNING DOCUMENTS ARE VOIDABLE, NOT ABSOLUTELY VOID

¶24 Mountaintop argues that the district court erred in concluding that the HOA's authority has been ratified, because the court did not determine as a preliminary matter whether the HOA's governing documents were void or voidable—and void documents cannot be ratified. Mountaintop asserts that the HOA's governing documents are absolutely void, and consequently the HOA's authority is incapable of ratification.

¶25 The HOA's primary response is that Mountaintop did not preserve this argument. The HOA may have a point. But we do not resolve the preservation issue here, because we have already rejected this issue on the merits in another case involving the same HOA, the same governing documents, and substantially the same argument. *See WDIS, LLC v. Hi-Country Ests. Homeowners Ass'n, Phase II (WDIS II)*, 2022 UT 33, 515 P.3d 432. And that case is controlling here.

¶26 In *WDIS II*, we held with respect to the same governing documents that "restrictive covenants that are recorded without the signature of the affected landowner are voidable, not absolutely void, and they are therefore ratifiable." *Id.* ¶ 52. In that case, the plaintiffs were various persons and entities that owned property within the HOA. *Id.* ¶ 3 n.2. They claimed to have evidence that the man who had incorporated the HOA and signed the initial governing documents, Charles Lewton, did not own most of the land he included in the HOA's boundaries. *Id.* ¶ 5. They sought to quiet title to their properties, and moved for a declaration that the HOA's governing documents were absolutely void. *Id.* ¶ 9. We explained,

> [T]he distinction between void and voidable is important because a contract or a deed that is void cannot be ratified or accepted, and anyone can attack

its validity in court. In contrast, a contract or deed that is voidable may be ratified at the election of the injured party. Once ratified, the voidable contract or deed is deemed valid.

*Id.* ¶ 14 (cleaned up) (quoting *Ockey v. Lehmer*, 2008 UT 37, ¶¶ 15, 18, 189 P.3d 51).

¶27 We observed that we "start with the presumption that contracts are voidable unless they clearly violate public policy." *Id.* ¶ 15 (cleaned up) (quoting *Ockey*, 2008 UT 37, ¶ 21). And to overcome this presumption, a party's showing that the documents violate public policy must be "free from doubt." *Id.* To make such a determination, we ask "(1) whether the law or legal precedent has declared that the type of contract at issue is unlawful and absolutely void, and (2) whether the contract harmed the public as a whole—not just an individual." *Id.* ¶ 21 (cleaned up) (quoting *Wittingham, LLC v. TNE Ltd. P'ship*, 2020 UT 49, ¶ 24, 469 P.3d 1035)).

¶28 Like Mountaintop, the landowners in *WDIS II* argued that the governing documents were void because they violate public policy as expressed in the Statute of Frauds, the Wrongful Lien Act, and appellate caselaw. *See id.* ¶ 23. But we rejected this argument. We concluded that these sources do not express a public policy that the governing documents violate, so the landowners had not overcome the presumption that the governing documents were merely voidable. *Id.* ¶¶ 2, 13. Accordingly, we held that "restrictive covenants that are recorded without the signature of the affected landowner are voidable, not absolutely void, and they are therefore ratifiable." *Id.* ¶ 52. And this holding applies here.

¶29 As we observed in *WDIS II*, this holding simply defers to the HOA members' collective decision to either reject or ratify the HOA's authority, rather than deciding the matter for them as a matter of law. *Id.* ¶¶ 16–22. And under these circumstances, where covenants have existed for decades, the reliance interests of the hundreds of other owners in the HOA "may be especially substantial." *Id.* ¶ 19.

¶30 Having determined that the governing documents are voidable rather than absolutely void, we now analyze whether the district court correctly concluded that the HOA's members have collectively ratified the HOA's authority, including its authority to assess property within its boundaries.

## II. THE HOA MEMBERS HAVE RATIFIED THE HOA'S AUTHORITY

¶31   The district court concluded that the residents within the HOA had collectively ratified the HOA's authority over time, including the HOA's authority to assess property within its boundaries, such as Lot 90. Mountaintop argues that this was error because the district court did not make sufficient findings to satisfy the elements of ratification, and because the collective conduct the court relied upon does not satisfy the Statute of Frauds. We disagree.

¶32   As an initial matter, we clarify that the question in this case is whether the HOA's members have ratified the HOA's *authority* in general, and its *authority to assess* the property within its boundaries in particular. Mountaintop's analysis focuses on whether the members have ratified the governing documents. And it is correct that the HOA was originally established and empowered by those documents. But here, the precise question is whether the HOA had authority to levy annual assessments, as contemplated in those allegedly flawed documents. Therefore, as we explain in *Hi-Country Estates Homeowners Ass'n, Phase II v. Frank*, our analysis focuses on whether the HOA members have ratified the HOA's *authority*. 2023 UT 7, ¶ 50 --- P.3d ---. And we do not comment upon whether the documents as a whole have been ratified, as that question is not presented here.

¶33   In *Frank*, we analyzed the applicability of our analysis in *Swan Creek Village Homeowners Ass'n v. Warne*, 2006 UT 22, 134 P.3d 1122, to the circumstances here. In *Swan Creek*, we held that a "[homeowners association] possesse[d] the authority to levy assessments on property in the Swan Creek subdivision because the lot owners *collectively ratified* its authority to act as the association contemplated by the Declaration." *Id.* ¶ 55 (emphasis added). In that case, a developer had incorporated a homeowners association to govern a development in Rich County, and had recorded with the county a "Declaration of Reservations, Restrictions and Covenants of Swan Creek Village (the "Declaration")." *Swan Creek*, 2006 UT 22, ¶ 2 (cleaned up). But before the development was complete, the developer declared bankruptcy and abandoned the project. *Id.* ¶ 3. The homeowners association did not file the requisite annual report or pay its filing fee, and it was involuntarily dissolved. *Id.* To fill the void, an owner of a lot within the subdivision incorporated a new homeowners association "using the identical name and articles of

incorporation used by the Original Association." *Id.* ¶ 4. He called a meeting of all lot owners. *Id.* "More than 100 people, representing almost half of the lot owners, attended the meeting and elected a board of directors for the [homeowners association]." *Id.*

¶34 Years later, a person bought a lot within the subdivision and refused to pay an assessment that the homeowners association had levied on the property. *Id.* ¶¶ 8–10. The homeowners association sued the owner. *Id.* ¶ 11. And the owner argued that the homeowners association had no right to levy the assessment "because [it was] not the association contemplated under the Declaration and because an insufficient number of lot owners voted to ratify its authority." *Id.* ¶ 30.

¶35 We rejected this argument and held that the homeowners association was valid and authorized to impose assessments pursuant to the Declaration. *Id.* ¶ 31. We explained that "the [homeowners association]'s authority to impose assessments on Swan Creek lot owners pursuant to the terms of the declaration [had] been repeatedly ratified by the lot owners over a period of many years." *Id.* So even though there appeared to be no record evidence that the Declaration had been formally amended to recognize the new homeowners association, and there were disputed factual issues regarding "whether a majority of the lot owners formally approved the substitution of the [new homeowners association]," those facts were immaterial in light of the lot owners' ratification. *Id.* We reaffirmed that "[w]here property owners have treated an association as one with authority to govern and impose assessments contemplated under the terms of a duly recorded governing declaration, they ratify its authority to act." *Id.* ¶ 32.

¶36 In reaching that conclusion, we found relevant that the homeowners association "ha[d] acted as a valid association for almost twenty years, during which time the lot owners ha[d] collectively accepted its management"; the "lot owners ha[d] paid their dues to the [homeowners association]"; "only 24 of the 538 lot owners had not paid" the assessment at issue in the case; the homeowners association had managed the property within Swan Creek; the articles of incorporation and the Declaration had been on file for years before the defendant acquired the property; the homeowners association had been recognized as valid in another court case, which imparted additional notice of the homeowners association's authority; there had been a "pattern of acquiescence

by the lot owners"; and "no competing association had emerged." *Id.* ¶¶ 38–39.

¶37 Here, the district court relied upon similar facts to conclude that the HOA's members in general, and Engle and Mountaintop in particular, had ratified the HOA's authority because they had "acted as though the HOA had authority to assess Lot 90." The district court explained,

> Because the HOA's Articles of Incorporation and Covenants were of record when Mountaintop took ownership of Lot 90, because decades have passed since the time those documents were recorded, because the members of the HOA have since acted as though the HOA was a legitimate governing entity for decades and because no competing entity has arisen, the Court rules that the HOA's ability to govern and make assessments against the lots within its purported jurisdiction has been ratified by its members.

¶38 And the court concluded that Engle and Mountaintop had ratified the existence and authority of the HOA by "failing to challenge that authority at any time during the course of ownership since 1983, by expressly admitting such authority in the [2015] Petition[,] . . . and by paying charges and assessments at various times."

¶39 The court also relied on our analysis in *Swan Creek* and its progeny to rule that such collective ratification was sufficient to overcome the alleged deficiencies in the HOA's governing documents:

> Utah law is clear that even if there was some technical deficiency with one or more of the HOA's governing documents, the fact that the HOA has been existing, living and breathing as a homeowner association for 40 years, conducting meetings and elections, governing the lots at issue, making, collecting and enforcing assessments for decades, making improvements, creating committees—all with decades of cooperation of and participation from its members—means that the authority to act as such has been ratified by its members as a matter of law.

(Citing *Swan Creek*, 2006 UT 22, ¶¶ 30–39, and *Osmond Lane Homeowners Ass'n v. Landrith*, 2013 UT App 20, ¶ 17, 295 P.3d 704.)

¶40 Mountaintop challenges the district court's decision. It argues that the governing documents are subject to the Statute of Frauds and, therefore, any ratification must be in a writing. And it asserts that the court was required to find that those ratifying the HOA's authority "had full knowledge at the time of the ratification of all material facts and circumstances relative to the unauthorized act or transaction." (Quoting *Jones v. Mut. Creamery Co.*, 17 P.2d 256, 259 (Utah 1932).) For these propositions, Mountaintop relies on cases outside of the context here, including cases involving "ratification as it relates to the law of agency." *Jones*, 17 P.2d at 259; *see also generally Bradshaw v. McBride*, 649 P.2d 74 (Utah 1982). But as we explain in *Frank*, these cases involve a different scenario and do not control here. *See Frank*, 2023 UT 7, ¶¶ 60–66.

¶41 *Swan Creek* exemplifies that, even where real property is involved, we do not always require that ratification be evidenced in a writing or that the writing demonstrate an intent to ratify the relevant defect. *See Swan Creek*, 2006 UT 22, ¶¶ 30–39. There, we did not require a writing to show that the affected landowners had ratified the authority of the homeowners association. *Id.* And we did not ask whether the landowners were aware of the defect in that case—specifically, that the homeowners association was not the one established in the Declaration, but a substitute homeowners association with the same name, which had been formed by a lone lot owner. *See id.* Instead, we concluded that the conduct of the landowners was sufficient to ratify the authority of the homeowners association, where the landowners had treated the homeowners association as if it had the authority to govern and impose assessments, accepted its management activities, paid dues, and demonstrated an overall "pattern of acquiescence" over a period of time. *Id.* ¶¶ 32, 39.

¶42 Mountaintop argues that *Swan Creek* does not apply here because that case involved the ratification of a homeowners association that was operating pursuant to a "duly recorded" declaration. It views this as a "critical distinction" between *Swan Creek* and the circumstances here.

¶43 We disagree. "Duly recorded" means only that a document has been filed with an entity pursuant to law in a

manner that gives notice of its contents and legal effect.[2] In the present context, it means only that the subject documents were properly recorded with the county recorder. We found this fact relevant in *Swan Creek* because it showed the defendant had notice of the documents. 2006 UT 22, ¶ 38 ("[T]he [homeowners association's] articles of incorporation and the Declaration were on file and had been on file for years before [the defendant] acquired her lots.").

¶44  As in *Swan Creek*, there is no dispute that the governing documents here were "duly recorded." And the district court properly found this to be relevant, observing that the articles of incorporation and protective covenants were on file when Engle purchased Lot 90 decades earlier.

¶45 But we acknowledge, as we do in *Frank*, that the allegations in this case differ from those in *Swan Creek*. There, the

---

[2] While *Black's Law Dictionary* does not define the phrase "duly recorded," the definitions it provides for the phrase's constituent terms provide guidance. *Black's* defines "duly" as: "In a proper manner; in accordance with legal requirements." *Duly*, BLACK'S LAW DICTIONARY (11th ed. 2019). And it defines the verb "record" as: "To deposit (an original or authentic official copy of a document) with an authority." *Record*, BLACK'S LAW DICTIONARY (11th ed. 2019). Further, it is implicit in our case law dating back to at least the early half of the twentieth century that "duly recorded" simply means that a document has been properly filed with an entity in a manner that provides notice of its contents and legal effect. *See, e.g.*, *McCready v. Fredericksen*, 126 P. 316, 316 (Utah 1912) ("[S]aid certificate was *duly recorded* in the office of the county recorder of Salt Lake county, Utah, on the 22d day of March, 1897, in a book therein provided by law to be kept for that purpose, to wit, Book A of Tax Sales, page 27, line 18, of the records of said county." (emphasis added)); *Nat'l Realty Sales Co. v. Ewing*, 186 P. 1103, 1104 (Utah 1920) ("After the period of redemption had expired, to wit, on January 20, 1917, said sheriff made and executed a sheriff's deed to H. J. Ewing for the said lands which deed was *duly recorded* in the office of the county recorder for Utah county on said day." (emphasis added)); *Ferguson v. Mathis*, 85 P.2d 827, 828 (Utah 1938) ("The mortgage was *duly recorded* the following day in the office of the County Recorder of Carbon County." (emphasis added)).

defendant alleged that the substitute homeowners association was invalid. *Id.* ¶ 30. Here, Mountaintop alleges something more—that the HOA was *never* validly established. For this reason, *Swan Creek* is not directly controlling. But we conclude that the principles underlying *Swan Creek* apply to the circumstances here, and we therefore extend the rationale of that case to the facts in this one.

¶46 Although an encumbrance on real property was involved in *Swan Creek*, we were willing to excuse rigid adherence to the Statute of Frauds' general writing requirement because, among other things, there was notice of the encumbrance (because it was duly recorded), the encumbrance had been in place for a significant period of time before the defendant challenged its validity, and during that time period the affected landowners' conduct demonstrated acceptance of the encumbrance and acquiescence to the authority of the HOA. *Id.* ¶¶ 38–39. These guiding principles mirror the foundational concepts at work in other real property contexts where we have been willing to excuse the writing requirement, including the doctrines of boundary by acquiescence, adverse possession, and prescriptive easement. *See Q-2 L.L.C. v. Hughes*, 2016 UT 8, ¶ 10 n.15, 368 P.3d 86 (explaining that boundary by acquiescence requires, among other things, "occupation" and "mutual acquiescence" for "at least 20 years" (cleaned up)); *Anderson v. Fautin*, 2016 UT 22, ¶ 25, 379 P.3d 1186 ("[O]ne who claims property by adverse possession must show that his use and possession of the property has been actual, open and notorious, and continuous for the statutory period." (cleaned up)); *Kiernan Fam. Draper, LLC v. Hidden Valley Health Ctrs., LC*, 2021 UT 54, ¶ 41, 497 P.3d 330 ("To obtain a prescriptive easement, a party must establish a [property] use that is (1) open, (2) notorious, (3) adverse, and (4) continuous for at least 20 years." (cleaned up)).

¶47 Applying those guiding principles here, we conclude that the repeated conduct of the HOA members over an extended period—generally, the members' decades-long treatment of the HOA as a legitimate governing entity and, more specifically, Engle and Mountaintop's express acknowledgment of the HOA's authority to levy assessments and periodic payments of such assessments—constitutes ratification of the HOA's authority. As in *Frank*, Mountaintop's challenge to the HOA's authority is too late. And it has not identified any earlier objection to the HOA's authority, or Lot 90's inclusion in the HOA, by any prior owner of the property. All the while, the governing documents have been

publicly recorded—and thus available for anyone to review—for decades.[3] And the members of the HOA have recognized and relied upon the HOA's authority and management, accepted the HOA's services, and paid their assessments.

¶48 Lastly, we note that the distinction between the allegations made in this case and those made in *Swan Creek* may have been dispositive had we concluded that the governing documents were rendered absolutely void by the property owners' missing signature. But as we explained above, *supra* ¶¶ 26–30, the documents here are voidable, not absolutely void. So even if they were not signed by the property owners, they are not incapable of ratification. The only question here is whether ratification has taken place. And we conclude that the district court properly applied the rationale behind *Swan Creek* to the facts here to determine that the HOA members have collectively ratified the HOA's authority.

## III. MOUNTAINTOP HAS NOT SUFFICIENTLY CHALLENGED THE DISTRICT COURT'S CALCULATION OF THE UNPAID ASSESSMENTS

¶49 The district court ordered Mountaintop to pay the entire amount of unpaid assessments. Mountaintop argues that this was error because it should not be liable for the entire amount when it owns only a 50 percent interest in Lot 90.

¶50 Mountaintop relies on section 57-8a-201(1) of the Community Association Act (Act), which states that "[a]n owner

---

[3] In *Frank*, we note the relevance of a lack of a contemporaneous objection to Charles Lewton's alleged actions. *Hi-Country Ests. Homeowners Ass'n, Phase II v. Frank*, 2023 UT 7, ¶ 73 n.7, --- P.3d ---. In *Swan Creek*, at the time of the homeowners association's formation, no questions were raised as to its authority and "the new HOA immediately began to act under the terms of the Declaration." *Swan Creek Vill. Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 5, 134 P.3d 1122. Similarly, Mountaintop has not alleged that any previous owner of Lot 90 objected to its inclusion in the HOA or the formation of the HOA. While Mountaintop asserts, as do the trusts in *Frank*, that Charles Lewton encumbered land he did not own, there is no record evidence that any prior owner of Lot 90 did anything other than acquiesce to Lewton's actions.

shall pay the owner's proportionate share of … any … assessments levied by the association." UTAH CODE § 57-8a-201(1). Mountaintop notes that the Act requires any payment to be "in the amount and at the time determined by the board of directors in accordance with the terms of the: (a) declaration; or (b) bylaws." *Id.* § 57-8a-201(2). And Mountaintop contends that requiring it to pay the entire assessment violates the 1980 Covenants, which state that "[e]ach grantee and lot owner … agrees to pay annually his pro-rata share" of annual assessments. Mountaintop asserts that the plain language of these two sources suggests that assessments are meant to be levied "against lot owners, not lots" and "made on a pro-rata basis." And it argues that the district court erred in imposing 100 percent of the unpaid assessments on a 50 percent owner.

¶51 However, other than asserting that the terms "proportionate" and "pro rata" refer to ownership interests rather than lots, Mountaintop does not provide any interpretive or legal analysis to explain why this is so. And it does not explain why the district court was wrong in concluding that those terms referred to lots rather than ownership interests.

¶52 Accordingly, Mountaintop has failed to carry its burden of persuasion on this issue. "It is the appellant's job to tell us where and how the district court went wrong." *Pinder v. Duchesne Cty. Sheriff*, 2020 UT 68, ¶ 36, 478 P.3d 610; *Kendall v. Olsen*, 2017 UT 38, ¶ 12, 424 P.3d 12 ("Our rules of appellate procedure place the burden on the appellant to identify and brief any asserted grounds for reversal of the decision below."). To carry its burden of persuasion on appeal, the appellant "must assert contentions of error that occurred in the proceedings below and develop a reasoned argument for why the purported errors should be reversed." *Pinder*, 2020 UT 68, ¶ 36 (quoting *Anderson v. Anderson*, 2018 UT App 19, ¶ 24, 414 P.3d 1069); *see also* UTAH R. APP. P. 24(a)(8) (stating that an appellant must "explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal"). Without meeting this threshold, we cannot conclude that the district court committed reversible error.

¶53 Here, Mountaintop simply points to the words "proportionate" and "pro-rata" in the Community Association Act and 1980 Covenants and asserts that these words require assessments to be apportioned based on its 50 percent ownership interest in Lot 90. But without more, Mountaintop has not

persuaded us that the district court erred in concluding that the proportionate share was based on lots rather than percentage of ownership. Accordingly, we affirm the district court's damages award.

## IV. THE HOA IS ENTITLED TO AN AWARD OF ITS ATTORNEY FEES ON APPEAL

¶54 Both parties request attorney fees under Utah Code section 57-8a-306, which allows a prevailing party to recover its costs and reasonable attorney fees in a judicial action brought under the Utah Community Association Act. Because the HOA has prevailed on appeal, we conclude that it is entitled to its attorney fees under this provision. We leave the amount of the fees to be determined by the district court.

## CONCLUSION

¶55 Protective covenants that were not signed by the property owner are voidable, but not void as against public policy. This means that they are capable of ratification. Here, the district court correctly ruled that the members of the HOA have ratified the HOA's authority to assess lots within its boundaries. Accordingly, the HOA had the authority to assess Lot 90. And Mountaintop has not persuaded us that the district court miscalculated the unpaid assessments it owes the HOA. Finally, as the prevailing party, the HOA is entitled to its attorney fees on appeal. We affirm.

─────────────